Argued and submitted September 18, 2012, Limited Judgment affirmed; appeal
from "Supplemental Limited Judgment" dismissed July 3, 2013

SHELTER PRODUCTS, INC.,
an Oregon corporation,
*Plaintiff,*

*v.*

STEELWOOD CONSTRUCTION, INC.,
a Washington corporation,
*Defendant-Respondent,*

*and*

CATAMOUNT CONSTRUCTORS, INC.,
a Washington corporation,
*Defendant,*

*and*

HD SALEM OR LANDLORD, LLC;
and SAFECO Insurance Company of America,
a Washington corporation,
*Defendants.*

STEELWOOD CONSTRUCTION, INC.,
*Third-Party Plaintiff,*

*v.*

HOME DEPOT, INC.,
*Third-Party Defendant.*

Marion County Circuit Court
10C20285; A148959

307 P3d 449

D. Brent Carpenter argued the cause for appellant. With him on the briefs were Joseph A. Yazbeck, Jr., and Yazbeck, Cloran & Bowser, PC.

Shawn A. Elpel, Washington, argued the cause for respondent. On the brief were Albert F. Schlotfeldt and Duggan Schlotfeldt & Welch PLLC.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

SERCOMBE, J.

## SERCOMBE, J.

This case involves a dispute between a general contractor, Catamount Constructors, Inc. (Catamount), and one of its subcontractors, Steelwood Construction, Inc. (Steelwood).[1] Catamount contracted with Steelwood to perform work and provide certain materials for the construction of the Salem Home Depot regional distribution center (the project). However, after Steelwood provided the materials in question and began work on the project, Catamount terminated its agreement with Steelwood "for convenience." Steelwood filed a construction lien on the project and, as part of this action, alleged claims for, among other things, breach of contract and construction lien foreclosure.[2] Thereafter, Steelwood sought summary judgment against Catamount and, after a hearing, the trial court granted the motion and entered a limited judgment against Catamount.[3] On appeal, Catamount raises five assignments of error, asserting that the trial court erred in granting summary judgment in favor of Steelwood. For the reasons explained below, we affirm the grant of summary judgment.

When reviewing a trial court's grant of summary judgment, we view the facts and all reasonable inferences that may be drawn from them in the light most favorable to the nonmoving party—in this case, Catamount. *Vaughn v. First Transit, Inc.*, 346 Or 128, 132, 206 P3d 181 (2009).

---

[1] Both Catamount and Steelwood were defendants in an action initiated by Shelter Products, Inc. (Shelter Products), one of Steelwood's suppliers for the project. Steelwood then filed cross-claims against Catamount. Shelter Products eventually obtained payment and dismissed its claims. It is Steelwood's claims against Catamount that are at issue on appeal.

[2] After the lien was recorded, Catamount filed a release of lien bond.

[3] The trial court subsequently entered a "Supplemental Limited Judgment" awarding Steelwood attorney fees and costs. It also entered a "Second Supplemental Limited Judgment" awarding Steelwood additional fees and costs. We note, first, that Catamount did not file a notice of appeal from the "Second Supplemental Limited Judgment." Furthermore, this court has held that a supplemental judgment awarding attorney fees based on a limited judgment is not appealable. *See Interstate Roofing, Inc. v. Springville Corp.*, 217 Or App 412, 426-27, 177 P3d 1, adh'd to as modified on recons, 224 Or App 94, 197 P3d 27 (2008), aff'd in part and rev'd in part on other grounds, 340 Or 144, 218 P3d 113 (2009). Accordingly, this court does not have jurisdiction over Catamount's appeal from the "Supplemental Limited Judgment" and that portion of this appeal must be dismissed.

Catamount, as noted, was the general contractor on the project and hired Steelwood as a subcontractor. Catamount and Steelwood entered into a purchase order, a subcontract, and a joint check agreement. Pursuant to the purchase order, which was signed "in conjunction with the Subcontract for a complete Steel erection and panelized roof system," Steelwood was to provide materials for which Catamount was to pay a total of $300,000. Under the subcontract, Steelwood was to complete the installation of structural steel and the roofing system for the project. The agreement, which the parties signed on March 24, 2010, provided a schedule pursuant to which work was to begin by May 2010 and be completed in July. The subcontract specified that time was of the essence. Among other things, the subcontract provided that Catamount could terminate the agreement for convenience:

"18.  Termination for Convenience. The Contractor may, upon seven (7) days written notice to the Subcontractor, without cause and without prejudice to any other right or remedy, terminate this Subcontract, in whole or in part, for its convenience. Upon receipt of any such notice, Subcontractor shall, unless the notice directs otherwise, immediately discontinue the work on that date and to the extent specified in the notice, place no further orders or subcontracts for materials, equipment, services, or facilities, except as may be necessary for completion of such portion of the work as is not discontinued; promptly make every reasonable effort to procure cancellation upon terms satisfactory to Contractor of all orders and subcontracts to the extent they relate to the performance of the discontinued portion of the work and shall thereafter do only such work as may be necessary to preserve and protect work already in progress and to protect materials, plant and equipment on the site or in transit thereto. The obligations of the Subcontractor shall continue as to portions of the work already performed and as to bona fide obligations assumed by Subcontractor prior to the date of termination. Subcontractor shall be entitled to be paid the full cost of all work properly done by Subcontractor to the date of termination not previously paid for, less sums already received by Subcontractor on account of the portion of the work performed. Should the Contractor's termination of the Subcontract under this

paragraph be deemed improper or wrongful, then such termination shall be deemed automatically to have occurred pursuant to Contractor's rights under paragraph 17."

(Boldface omitted.) The agreement also provided that Catamount could make payment to Steelwood through joint checks made payable "to the joint order of [Steelwood and its] sub subcontractors, suppliers or others * * *." The joint check agreement, executed by representatives of Catamount, Steelwood, and Shelter Products (one of Steelwood's suppliers on the project) on the same day as the subcontract,[4] provided that Catamount would "endeavor to make monthly payments jointly to [Shelter Products] and [Steelwood] for all amounts owing to [Shelter Products] during the course of the Project * * *."

All of the materials required under the purchase order were delivered to the work site and, thereafter, Steelwood invoiced Catamount for those materials. Catamount did not pay the invoice at that time. After Steelwood began work on the project, on Wednesday, June 16, 2010, Catamount's project manager sent Steelwood a letter outlining concerns about the progress of work on the project. In particular, he set out several issues: (1) there would be additional costs if the work was not complete within the agreed time period; (2) daily housekeeping at the work site was inadequate and Catamount planned to begin cleaning up after Steelwood and billing Steelwood for that; (3) certain work was deficient—certain braces and nailing were incomplete and some nails, bolts, and plates were missing; and (4) "[p]roduction is not where committed to in [the] contract." The project manager stated that "[o]n Monday morning we will evaluate where you are and how to best assist you in meeting your contractual obligations." However, on Saturday, June 19, 2010, Catamount terminated the contract for convenience pursuant to paragraph 18 of the subcontract. Accordingly, on Monday, June 21, Steelwood vacated the work site.

After it terminated Steelwood for convenience, Catamount refused to pay Steelwood's invoice for materials delivered under the purchase order. It also declined to pay

---

[4] Catamount's representative signed the joint check agreement on March 23, 2010, and representatives of the other two companies signed on March 24, 2010.

Steelwood for work performed under the subcontract prior to termination. Thereafter, Steelwood recorded a construction lien for $369,679.30. Several of Steelwood's suppliers for the project—Shelter Products, White Cap Construction Supply, and Ahern Rentals—also filed construction liens on the property, and Catamount posted bonds on those liens.

Catamount, for its part, cleaned debris left by Steelwood on the project site and entered into a subcontract with a new company, Panelized Structures, to complete the work Steelwood was to have done. According to Catamount, it incurred $75,440 in conjunction with the clean up and to repair Steelwood's work:

> "That amount is comprised of $61,668 which Catamount paid to Panelized Structures to repair and clean up Steelwood's defective work; $276.00 Catamount incurred for clean-up of the Project site that it performed; $150.00 Catamount spent to hire a locksmith to enter a storage unit which Steelwood had left locked; and $13,350.00 which Catamount incurred in additional labor and travel costs in coordinating and supervising the above-described repairs and clean-up."[5]

---

[5] In particular, to "repair Steelwood's defective work," Panelized Structures had to do work pursuant to a number of change orders:

"Change Order 1 totaled $4,225.00 and required Panelized Structures to cut joists to the center of girders, install nailers on concrete walls, cover openings with plywood, replace missing studs in mechanical openings, replace 2x6s over girders, and install blocks. Change Order 2 totaled $5,611.00 and required Panelized Structures to relocate mechanical openings, finish placing 2x6s over girders, frame five fill bays between doublers, and clean up material left behind by Steelwood. Change Order 3 totaled $3,134.00 and required Panelized Structures to pull nails, remove and relocate incorrect mechanical openings, clean the rooftop, and set straps. Change Order 4 totaled $3,876.00 and required Panelized Structures to correct Steelwood's over-nailing of plywood, install 6x6 nailers, and tear out and replace frame rooftop unit # 1. Change Order 5 totaled $13,019.00 and required Panelized Structures to pick up nails left behind by Steelwood, install additional tie straps, add nails to tie straps in area installed by Steelwood and at the request of the inspector, install new subperlin as a corrective measure as required by the Project structural engineer, and repair roof nailing. Change Order 6 totaled $2,215.00 and required Panelized Structures to perform additional bolting and welding on work performed by Steelwood, install 2x6s as directed by the Project structural engineer to repair Steelwood's work, and further clean rooftop area in which Steelwood had performed work. Change Order 7 totaled $1,669.00 and required Panelized Structures to reinstall joist brackets that were incorrectly installed by Steelwood and bolt plates at girder that were missed by Steelwood. Change Order 9 totaled $14,289[.00] and required Panelized Structures to reinstall additional joist brackets that were incorrectly installed by Steelwood and install a 6x6 nailer. Change Order 10 totaled $6,400.00 and

However, after terminating the contract with Steelwood, Catamount did not provide Steelwood with notice that its work was defective or needed repair, nor did it give Steelwood an opportunity to enter the work site with respect to any defects in the work it performed.

After filing its lien, Shelter Products filed an action against Steelwood and Catamount to obtain payment for the materials it had provided on the project. Steelwood, in turn, filed cross-claims against Catamount for payment of the materials and labor it had supplied under the purchase order and subcontract. Catamount then asserted that it was entitled to an offset and maintained that Steelwood was responsible for the amounts Catamount incurred repairing the work Steelwood had done and for attorney fees and other amounts incurred by Catamount relating to the liens. While the action was pending, Catamount paid Shelter Products, White Cap Construction Supply, and Ahern Rentals the amounts they were owed and discharged their liens.

Eventually, Steelwood sought summary judgment against Catamount on its claims for construction lien foreclosure and breach of contract, asserting that it was entitled to recover the amount owed under the purchase order and, as a result of the termination for convenience, the full cost of all work it had performed under the subcontract. In particular, as costs, it asserted it was entitled to recover amounts it expended on the project as well as profit and overhead. Catamount responded that Steelwood was not entitled to summary judgment because "Catamount's costs incurred in repairing Steelwood's defective work, in discharging Steelwood's suppliers' and subcontractor's liens, and its costs relating to Steelwood's overstated lien total a greater sum than it owes Steelwood under the subcontract between them." Steelwood

---

required Panelized Structures to purchase additional materials to replace materials that Steelwood had overnailed. Change Order 11 totaled $2,319.00 and required Panelized Structures to relocate two columns placed by Steelwood. Change Order 13 totaled $3,269.00 and required Panelized Structures to purchase additional nails to correct Steelwood's work. Change Order 14 totaled $702.00 and required Panelized Structures to purchase special nails to attach additional subperlins which the Project engineer ordered to correct Steelwood's work. Change Order 15 totaled $940.00 and required Panelized Structures to purchase special nails to attach additional subperlins which the Project structural engineer ordered to correct Steelwood's work."

replied, in part, that, because Catamount had terminated Steelwood for convenience, it could not avoid paying by asserting that the work Steelwood had done was defective. Furthermore, according to Steelwood, it was "terminated from the site before finishing" work and was not given notice after that termination that its work was defective.

At the end of the hearing on the summary judgment motion, the court ruled from the bench and granted summary judgment in favor of Steelwood. It explained:

> "Catamount argues that summary judgment should not be granted because, 'Its costs incurred in repairing Steelwood's defective work, and discharging Steelwood's supplies, and subcontractor liens, and its costs relating to Steelwood's overstated lien total a great[er] sum than the amount it owes Steelwood under the contract.'

> "So Catamount is admitting that it does owe money under the contract. It just says at the end of the day there are no damages. So that gets us to address the two bases of damages that it claims are the offset.

> "The first is the purchase order, which we've just been discussing. And the court finds under these circumstances that it was an act or omission of the contractor, not an act or omission of the subcontractor that started the chain of events that resulted in these subs not being paid.

> "When looking at both the contract and the joint check agreement, which is an agreement in pari materia, or reading them both together, Catamount was to endeavor to make monthly payments jointly to the supplier and subcontractor, and all amounts owing to the supplier during the course of the project. And this was not done.

> "So when I read act or omission subparagraph 32 [of the subcontract], in light of the joint check agreement * * * I conclude that even looking at the facts in light most favorable to Catamount in this regard."

Turning to the issue of whether "the 'repair of defective work' [defense] is somehow viable," the court explained:

> "Looking at the evidence in light most favorable to Catamount, they're claiming $75,444. And the Court agrees with [Steelwood's argument] that when there is a

termination for convenience, not a termination for cause, there's been no opportunity to inspect and cure. In fact, the exhibit that was provided by Catamount itself clearly demonstrates that. The exhibit * * * suggest[s] that there be a Monday meeting. Never was a Monday meeting because by Saturday the date of the termination of convenience was executed.

"So to go back now without giving [Steelwood] an opportunity to inspect, to cure, to do anything, and just say that the contract somehow allows under termination of convenience for the contractor to then go in and discover all of these things that it now charges against the subcontractor, is not provided by the terms of the contract, is not provided by any case law that I can find. And I don't think it's appropriate.

"So that $75,444 does not offset the amount owed for Catamount's breach, which as I said it essentially admitted in this matter."

In view of the payments to suppliers by Catamount during the litigation, the court determined that it owed $27,737.84 on the purchase order. With respect to Steelwood's cost on the project, the court observed that approximately $50,000 was actual cost owed. However, Steelwood sought profit and overhead as well. The court initially determined that there was not sufficient legal authority for the recovery of profit and overhead, which Steelwood asserted amounted to $27,231.90 (according to Steelwood, at the time of the termination, it was owed $60,785.50 for work performed and its profit and overhead would have been 44.8 percent over and above that). Later in the hearing, Steelwood asserted that, even if the court did not award profit, it should recover some amount for its overhead. The court questioned how that would be calculated: "[I]f 45 cents on the dollar is profit and overhead, are there documents that would tell me which portion of that 45 cents is profit, and which portion is overhead?" Steelwood responded that, because it did not anticipate the court's ruling, it had not broken the two amounts down in its affidavits, but that, typically, "profit's 20 percent, but your overhead is like 25 percent." The court observed that Steelwood's $61,633.30 lien did not include any amount for profit and overhead and, ultimately, decided

that it would simply allow the full lien amount. Thus, in its order, the court concluded that Steelwood "is entitled to collect its lien amount with respect to the purchase order in the amount of $27,737.84 and is entitled to collect, with respect to the subcontract, the amount of $61,633.30, which represents the full cost of all work[ ] performed by Steelwood until terminated by convenience by Catamount." In view of those conclusions, the court entered a limited judgment awarding Steelwood $89,417.14 along with prejudgment interest, post-judgment interest, and attorney fees and costs.

On appeal, we review the trial court's summary judgment ruling to determine whether we agree that "the pleadings, depositions, affidavits, declarations and admissions * * * show that there is no genuine issue as to any material fact and that the moving party is entitled to prevail as a matter of law." ORCP 47 C; *O'Dee v. Tri-County Metropolitan Trans. Dist.*, 212 Or App 456, 460, 157 P3d 1272 (2007). There is no genuine issue of material fact if, "based on the record before the court viewed in a manner most favorable to the adverse party, no objectively reasonable juror could return a verdict for the adverse party on the matter that is the subject of the motion for summary judgment." ORCP 47 C. In response to a summary judgment motion, "an adverse party may not rest upon the mere allegations or denials of that party's pleading," but must, by affidavits, declarations, or as otherwise provided by the summary judgment rule, "set forth specific facts showing that there is a genuine issue as to any material fact for trial." ORCP 47 D.

In its first assignment of error, Catamount contends that the trial court erred in granting summary judgment because Steelwood failed to provide legally sufficient evidence of its costs. In particular, Steelwood documented its costs in a profit and loss statement along with an affidavit from the president of the company stating that the profit and loss statement was "a true copy of all expenses incurred by Steelwood on the Home Depot Project under the subcontract." Catamount argues that, because the contract was terminated for convenience, the evidence provided by Steelwood was legally insufficient. It asserts that "[t]estimony alone" is insufficient. Furthermore, in its view,

in the absence of documentation (such as "invoices, receipts, or payroll records") to substantiate the profit and loss statement, Steelwood failed to demonstrate its costs with sufficient certainty. Steelwood responds that Catamount failed to preserve this issue for appeal and that, in any event, Steelwood "proved its actual costs with reasonable certainty" by providing a "profit and loss statement that showed its actual costs incurred on the project." We agree with Steelwood that Catamount failed to preserve the issue raised in its first assignment of error.

Ordinarily, this court will not consider an issue on appeal unless it was first presented to the trial court. ORAP 5.45(1). The preservation requirement is designed to apprise the trial court of a party's position so that the court can consider it, to avoid surprise and unfairness to the opposing party, and to foster full development of the record. *Peeples v. Lampert*, 345 Or 209, 219-20, 191 P3d 637 (2008). The "determination whether a particular issue was preserved for appeal is a 'practical one'; it will depend on whether the policies behind the preservation requirement—judicial efficiency, full development of the record, and procedural fairness to the parties and the trial court—are met in an individual case." *Charles v. Palomo*, 347 Or 695, 700, 227 P3d 737 (2010) (quoting *State v. Parkins*, 346 Or 333, 340-41, 211 P3d 262 (2009)). We will consider "an issue advanced by a party on [appeal] as long as that party raised the issue below with enough particularity to assure that the trial court was able to 'identify its alleged error' so as to 'consider and correct the error immediately, if correction is warranted.'" *Id.* (quoting *State v. Wyatt*, 331 Or 335, 343, 15 P3d 22 (2000)).

In this case, in its motion for summary judgment, Steelwood asserted that the "full cost" of the work it performed was $60,785.50 plus profit and overhead and that, in view of a payment Catamount made to a subcontractor of Steelwood, the amount still owed was $50,225.50 plus profit and overhead. It attached to its motion an affidavit from Steve Eckman, the company president, stating that, at the time of the termination for convenience, "Steelwood

was owed not less than $60,785.50 for work performed under the Subcontract plus profit and overhead," and that Steelwood was still "owed at a minimum, $50,2[2]5.50" plus profit and overhead. Catamount, in its response to the motion for summary judgment, asserted, among many other things, that "Steelwood provides no substantiation, not even the slightest detail, of how it arrived at the amount it is allegedly owed under the Subcontract. Is it the reasonable value of its labor? Even if it is, the reasonable value of Steelwood's labor is irrelevant because the parties had entered into the Subcontract." Thereafter, Steelwood filed a reply and attached to it a supplemental affidavit from Eckman. Furthermore, Steelwood attached to Eckman's affidavit Exhibit C, which Eckman stated was "a true copy of all expenses incurred by Steelwood on the Home Depot Project under the subcontract." Exhibit C is a profit and loss statement that includes a breakdown of Steelwood's expenses on the project for, among other things, payroll, construction supplies, equipment rental, fuel, and postage and delivery.

At the hearing, the court noted that Steelwood had submitted "documentation here to say [that it] spent around $50,000." It was Catamount's position, however, that it was entitled to offset its expenses to repair the work done by Steelwood against the amount Steelwood asserted was owed under the subcontract. The court, during the hearing, specifically noted Exhibit C in an exchange with Catamount's counsel:

"[CATAMOUNT'S COUNSEL]:   I mean even accepting that $60,785.50 number—

"THE COURT:   Yeah.

"[CATAMOUNT'S COUNSEL]:   —it's still—at the end of the day, they still owe us $33,000.

"THE COURT:   Okay. So you'll at least go with me as far as to say probably now that we have Exhibit C, the $50,000 that they say they actually spent is a fair representation of what they actually spent.

"[CATAMOUNT'S COUNSEL]:   Right."

As noted, before Exhibit C was submitted, Catamount asserted that Steelwood had failed to substantiate its asserted costs. However, Catamount never argued that the later submitted Exhibit C was insufficient to document those costs. And it certainly never expressed the position, as it does here, that, because the contract was terminated for convenience, to provide legally sufficient evidence of its costs, Steelwood could not rely on testimony and was required to submit certain types of documentation—invoices, receipts, payroll records, and the like—to substantiate the information contained in Exhibit C. Indeed, as set forth above, at the summary judgment hearing, Catamount appeared to agree with the trial court that, "probably now that we have Exhibit C, the $50,000 that they say they actually spent is a fair representation of what they actually spent." In other words, in the proceedings below, Catamount failed to make any argument that would have alerted the trial court and opposing counsel of its current assertion that the evidence submitted by Steelwood to substantiate its costs on the project is legally insufficient. Accordingly, we do not address the issue raised in Catamount's first assignment of error.

In its second assignment of error, Catamount contends that the court erred in awarding Steelwood overhead when Steelwood "had not met its burden of proving its overhead." In particular, Catamount complains that "Steelwood claimed a lump sum for both profit and overhead and did not segregate the amounts it claimed for profit and for overhead." According to Catamount, because the subcontract was terminated for convenience, Steelwood had the burden of proving overhead with "sufficient certainty" but "failed to provide a reasonable basis on which the trial court could compute [its] overhead" and "failed to present information sufficient to allow" the application of a federal formula for determining overhead. Steelwood responds that, first, this issue was not preserved before the trial court and, second, the "'overhead' costs awarded by the trial court were fair and reasonable, and determined with reasonable certainty." Again, we agree with Steelwood that Catamount failed to preserve before the trial court the arguments that it advances on appeal.

As with its first assignment of error, in support of its position that it preserved this argument, Catamount points to the assertion in its response to Steelwood's summary judgment motion that Steelwood had provided "no substantiation, not even the slightest detail, of how it arrived at the amount it is allegedly owed under the Subcontract." However, in context, that assertion clearly was not aimed at Steelwood's evidence relating to profit and overhead. Catamount's argument was as follows:

"The $105,195.74 figure [Steelwood seeks] is comprised of the amount owing under the Purchase Order, $27,737.84, plus the *amount allegedly currently owing under the Subcontract*, $50,225.03, plus its profit and overhead on the same, $27,231.90. Steelwood provides no substantiation, not even the slightest detail, of how it arrived at the amount it is *allegedly owed under the Subcontract*. Is it the reasonable value of its labor? Even if it is, the reasonable value of Steelwood's labor is irrelevant because the parties had entered into the Subcontract."

(Emphases added.) Thus, Catamount broke down three amounts sought by Steelwood: (1) the amount owing under the purchase order, (2) the amount "allegedly currently owing under the Subcontract," and (3) the profit and overhead. It asserted that Steelwood had failed to provide any substantiation of the second figure—the "amount it is allegedly owed under the Subcontract"—and did not contest the sufficiency of the proof submitted for the profit and overhead.

Indeed, Catamount's argument relating to profit and overhead in its opposition to the summary judgment motion had nothing to do with the sufficiency of Steelwood's proof. Instead, Catamount contended that Steelwood should only be able to recover for the percentage of work it had completed, and not the amount it sought as costs, profit, and overhead:

"Here, the Subcontract was for a lump sum amount of $286,734.00. As stated above, at the time of Steelwood's termination, it had—at best—completed nine percent (9%) of its work under the Subcontract. Nine percent of the total Subcontract amount of $286,734.00 equals $25,806.06. Thus, the total amount of work that Steelwood had completed at the time of its termination could not exceed

$25,806.06. As Steelwood admits in its motion, Catamount paid $10,560.47 of that total to Ahern, one of Steelwood's equipment suppliers on the Subcontract, thereby reducing the amount currently owed to Steelwood under the Subcontract to no more than $15,245.59.

"Because Steelwood is owed, at most, $15,245.59, not $50.225.03, its claim of profit and overhead of $27,231.90 is clearly erroneous. Further, in alleging that it is entitled to profit and overhead on that amount, Steelwood is actually seeking profit and overhead *on top* of profit and overhead. That is, when Steelwood submitted its bid to Catamount to perform its work on the Project in a lump sum amount of $286,734.00 that figure included Steelwood's costs, profit, and overhead. As a practical matter, if Steelwood had fully performed its work under the Subcontract, it would have received the total Subcontract amount of $286,734.00 and no additional sum for profit and overhead. As stated above, Steelwood performed nine percent of the Subcontract, and therefore is entitled to nine percent of that amount, at most. Because the total Subcontract includes profit and overhead, nine percent of that amount includes profit and overhead. To award Steelwood an additional $27,231.90 in overhead would be a windfall for Steelwood, to which it is not entitled."

(Citations omitted; emphasis in original.) The trial court rejected Catamount's assertion that Steelwood was entitled to recover only nine percent of the total contract price and concluded that Steelwood was entitled to recover its costs. With respect to profit, it was the court's view that there was not sufficient legal authority for such an award. It stated:

"I'm not going to allow that to be paid in this instance. I just don't see enough support for it. I have one little New York case. I don't have any Oregon law. I don't have anything in the statute. I don't have anything in the contract. I just don't have enough basis for it."

Later in the hearing, Steelwood brought up the issue of overhead:

"[STEELWOOD'S COUNSEL]:   We just want to clarify as far as the damages is the full cost, does that include the amounts for actual overhead. Because that's part of his cost as well, as opposed to profit, which is profit on top of that. Overhead is something that is actually is part of your

full cost. As so we just want to clarify if that's part of it, or not, and actually we request that the actual overhead portion should be part of the full cost of the damages.

"THE COURT: Well—

"[STEELWOOD'S PRESIDENT]: That's actual cost. That's actual cost, not full cost.

"THE COURT: $50,275 is actual cost.

"[STEELWOOD'S PRESIDENT]: Correct.

"THE COURT: And then you're stating that the other—the 45 cents on the dollar included not just profit, but overhead.

"[STEELWOOD'S PRESIDENT]: But overhead. Correct.

"THE COURT: And we didn't segregate the two when we were arguing about them. I only addressed the profit piece, and not the overhead piece. Is that—

"[STEELWOOD'S COUNSEL]: Correct, Your Honor.

"THE COURT: Okay. So question before I decide about that. How would we calculate—if 45 cents on the dollar is profit and overhead, are there documents here that would tell me which portion of that 45 cents is profit, and which portion is overhead? So that if you want a differential for overhead on top of this $50,000, what would it be? It wouldn't be 45 cents on the dollar because some of that's profit.

"[STEELWOOD'S COUNSEL]: Well, typically—and I'm not sure if it's stated in the affidavit, but I think profit's 20 percent, but your overhead is like 25 percent.

"\* \* \* \* \*

"[STEELWOOD'S PRESIDENT]: We didn't break it out. We weren't anticipating."

As Catamount notes, "the trial court allowed an additional $11,358.30 (*i.e.*, actual costs of $50,275 plus $11,358.30 in overhead for a total of $61,633.30) as overhead to Steelwood."

At no point before the trial court did Catamount raise any of the issues it seeks to argue in its second assignment of error—those are, that the court could not award overhead in the absence of an evidentiary submission segregating

amounts that Steelwood "claimed for profit [from amounts] for overhead," and that a federal formula should be used to compute Steelwood's overhead but that "Steelwood [had] failed to present information sufficient to allow" an analysis under that formula. Indeed, Catamount raised no issue at all regarding the proof of Steelwood's overhead and, when the issue of overhead was specifically discussed at the hearing, Catamount said nothing. Thus, as with the first assignment of error, before the trial court, Catamount failed to raise the issues it seeks to argue on appeal such that the trial court could have considered and corrected the alleged error immediately, if correction was warranted. *See Wyatt*, 331 Or at 343. Accordingly, we do not consider further Catamount's second assignment of error.

Catamount next argues, in its third assignment of error, that the trial court incorrectly concluded that Catamount was not entitled to offset any amount owed to Steelwood with costs "incurred in repairing Steelwood's defective work." According to Catamount, even though it terminated Steelwood for convenience, it continues to have a "right in breach of contract against Steelwood for its breach of the Subcontract by performing its work in a deficient manner." Steelwood responds that the "trial court properly rejected Catamount's request for setoff for alleged defective work, when Catamount terminated Steelwood for convenience, failing to give Steelwood notice and opportunity to inspect, cure, or complete its work." In Steelwood's view, a party cannot assert an offset after it has terminated for convenience. As explained below, we conclude that the trial court correctly concluded in this case that Catamount was not entitled to an offset.

As noted, the trial court observed that, "when there is a termination for convenience, [as opposed to] a termination for cause, there[ has] been no opportunity to inspect and cure." It concluded that neither the case law nor the terms of the subcontract would permit Catamount, after terminating Steelwood for convenience, to "go in and discover all of these things that it now charges against the subcontractor" and, thereby, receive an offset. We agree.

First, we agree with the trial court that, contrary to Catamount's assertions, the text of the termination for convenience clause, in context, does not under the circumstances of this case permit Catamount to both terminate Steelwood without cause *and* subsequently proceed against Steelwood as if it had terminated the agreement for cause. *See Yogman v. Parrott*, 325 Or 358, 361, 937 P2d 1019 (1997) (in interpreting a contractual provision, the court examines the text of the provision in context). Again, paragraph 18 of the subcontract provides that Catamount may, "without cause and without prejudice to any other right or remedy, terminate this Subcontract, in whole or in part, for its convenience." Upon receiving notice of termination for convenience, the subcontractor

> "shall *** immediately discontinue the work ***, place no further orders or subcontracts for material, equipment, services or facilities ***, promptly make every reasonable effort to procure cancellation upon terms satisfactory to Contractor of all orders and subcontracts to the extent they relate to the performance of the discontinued portion of the work and shall thereafter do only such work as may be necessary to preserve and protect work already in progress and to protect materials, plant and equipment on the site or in transit thereto. The obligations of the Subcontractor shall continue as to portions of the work already performed and as to bona fide obligations assumed by Subcontractor prior to the date of termination. Subcontractor shall be entitled to be paid the full cost of all work properly done by Subcontractor to the date of termination not previously paid for, less sums already received by Subcontractor on account of the portion of the work performed."

Catamount asserts that several clauses from that paragraph allow it to obtain an offset from Steelwood regardless of the fact that it terminated the agreement for convenience.[6] Initially, it states that the termination without cause is "without prejudice to any other right or remedy." That clause, however, does not itself confer any right or remedy. And it certainly does not, as Catamount asserts, permit Catamount

---

[6] We note that, although Catamount cites several portions of the contract that it asserts provide for the offset it seeks in this case, its arguments focus primarily on case law that it asserts supports its position.

to pursue two inconsistent paths simultaneously: both terminating the agreement for convenience *and* seeking damages against Steelwood as if it had terminated for cause and given Steelwood an opportunity to cure. As discussed below, Catamount fails to identify any generally applicable legal rule or provision of the contract that, in our view, would permit Catamount to both terminate without cause, fail to provide an opportunity to cure, and, at the same time, proceed against Steelwood as if it had terminated the agreement for cause and given an opportunity to cure. Accordingly, in our view, the "without prejudice" clause is not particularly helpful to Catamount's position.

Catamount also points out that paragraph 18 provides that Steelwood's obligations "continue as to portions of the work already performed" at the time of the termination for convenience and that it states that costs may be recovered for "all work properly done by Subcontractor." In Catamount's view, those clauses permit it to obtain an offset for work it deems deficient after terminating the agreement for convenience. We disagree. As to the reference to work "properly" done by the subcontractor, read in context, the term does not refer to the quality of work completed. Rather, the term unambiguously refers to work done by the subcontractor prior to termination for convenience, as opposed to work that should have been discontinued after the subcontractor received notice of termination. It is preceded by discussion of the requirement that, upon receiving notice of termination, the subcontractor must "immediately discontinue the work," "place no further orders or subcontracts for materials, equipment, services or facilities," "promptly make every reasonable effort to procure cancellation" of orders and subcontracts, and "thereafter do only such work as may be necessary to preserve and protect work already in progress and to protect materials, plant and equipment on the site or in transit thereto." Thus, only as to work done either prior to termination or under the terms of that provision will the subcontractor be entitled to recover its costs—only that work is "properly done." Thus, that phrase in paragraph 18 does not assist Catamount.

Likewise, the clause providing that Steelwood's obligations "continue as to portions of the work already

performed" does not permit Catamount to terminate for convenience and also obtain an offset under the circumstances of this case. We first note that the subcontract provides a warranty pursuant to which Steelwood warrants to the owner its work and materials. Thus, paragraph 18 would not relieve Steelwood of that obligation to provide a warranty—an existing obligation as to the work it already performed.

In addition, we observe that, in contrast with paragraph 18, paragraph 17 of the agreement (which relates to default) provides, among other things, that, if Steelwood fails to maintain Catamount's schedule or "fail[s] to correct, replace and/or re-execute faulty or defective work," Catamount "shall have the right to declare [Steelwood] in breach of this Agreement and may, without prejudice to any other right or remedy Contractor may have, terminate this agreement." If Catamount had terminated the agreement under paragraph 17, the agreement specifically provides that "Subcontractor shall not be entitled to any further payments until the Work covered by this Subcontract has been completed." Furthermore, "[i]f the expense to correct, replace or complete Subcontractor's work together with any liquidated damages attributable to delay in Subcontractor's performance exceeds the unpaid balance of the Subcontract, Subcontractor shall pay Contractor the difference." Thus, the remedy Catamount seeks here was available pursuant to its right to terminate for cause under paragraph 17. However, even that paragraph presupposes that, where Catamount terminates for cause based on defective work, there will have been provided an opportunity for Steelwood to "correct, replace and/or re-execute faulty or defective work." Catamount elected not to terminate for cause, but instead terminated for convenience and, therefore, required Steelwood to immediately stop work with no opportunity to inspect and cure.

Similarly, paragraph 10a(4), which permits Catamount to withhold payment under the subcontract "pending satisfactory correction, repair, replacement, and/or restoration of deficient work, materials, supplies, machinery, equipment or plant, or of any work rejected as not conforming with" the subcontract, does not entitle Catamount to the offset

in question. Again, immediately after sending the letter to Steelwood discussing its concerns with Steelwood's progress on the project, Catamount terminated the agreement pursuant to paragraph 18 "without cause." As required, Steelwood immediately discontinued work on the project and removed its equipment from the project site. Thereafter, Catamount did not request that Steelwood correct, repair, or replace any of the work that it had done on the project. Under those circumstances, nothing in the contract permits Catamount to receive an offset against Steelwood's costs for allegedly defective work done by Steelwood prior to the termination.

We further observe that, although, as the parties note, there are no previous Oregon cases discussing termination for convenience, there is some persuasive authority from other jurisdictions relating to the issue and that authority supports our view. In particular, we are persuaded, at least in the absence of an opportunity to correct allegedly defective work, that, where a party has terminated a contract for convenience, that party may not then counterclaim for the cost of curing any alleged default. *See Paragon Restoration Group, Inc. v. Cambridge Sq. Condominiums*, 839 NYS2d 658, 660, 42 AD3d 905, 906 (2007); *Tishman Contr. Corp. v. City of New York*, 643 NYS2d 589, 590, 228 AD2d 292, 293 (1996).[7] Here, the amounts Catamount seeks to offset are costs incurred in curing an alleged default by Steelwood. The facts on summary judgment are that, after it was terminated for convenience, Steelwood did no further work on the project as required under paragraph 18. After that time, Catamount did not notify Steelwood of any alleged defects or provide it with any opportunity to correct any defective work. Indeed, the defects in question were first asserted as part of this litigation. Under the

---

[7] Catamount asserts that, under federal authority, it has a right to an offset. As noted, we find the rule from the cases cited above persuasive. Furthermore, we observe that the Federal Circuit has declined to decide whether the government may deduct the cost of repairing or replacing defective work from a contractor's recovery following a termination by the government for convenience. *See Lisbon Contractors, Inc. v. United States*, 828 F2d 759, 769 (Fed Cir 1987). At least one administrative board with authority over federal government contracts has permitted an offset for defective work; however, in that case, it was noted that, "where no opportunity to correct deficiencies was afforded, no deduction for uncorrected work should be made." *Aydin Corp.*, EBCA No. 355-5-86, 89-3 BCA ¶ 22044, 1989 WL 74785.

circumstances, the trial court correctly concluded on summary judgment that, because it terminated the contract for convenience, Catamount was not entitled to offset any amounts it owed Steelwood with amounts it incurred in correcting Steelwood's allegedly defective work.

Finally, we turn to Catamount's fourth and fifth assignments of error. Those assignments both involve the same issue—that is, whether the trial court erred when it determined that Catamount was not entitled to offset amounts it owed Steelwood by amounts it incurred in discharging liens from Steelwood's suppliers on the project that were filed after Catamount terminated Steelwood for convenience. In order to discuss Catamount's assertions, some background is necessary.

As discussed above, Catamount and Steelwood executed both a subcontract and a purchase order relating to the project. Under the purchase order, Steelwood was to supply materials for the project for which Catamount was to pay $300,000. The subcontract contained a number of clauses. As pertinent to the fourth and fifth assignments of error, paragraph 32 of the subcontract provided that,

> "[i]f any lower tier subcontractor, laborer or supplier of [Steelwood] files a mechanic's lien or claim against [Catamount], its surety, or the Project, *which lien arises out of any act or omission of [Steelwood] under this Subcontract,* [Steelwood] shall satisfy or take steps to remove or discharge such lien or claim at [Steelwood's] cost and expense, including all recording fees, within five (5) days of the date of notice thereof. If such lien(s) is not discharged within 30 days, [Catamount] shall, without any further notice to [Steelwood], cause such lien to be discharged by any means [Catamount] deems appropriate. All costs incurred by [Catamount] to discharge or otherwise address said lien shall be borne by [Steelwood], including without limitation bonding costs and [Catamount's] reasonable attorney's fees."

(Emphasis added.) In light of that provision in the subcontract, in opposition to Steelwood's summary judgment motion, Catamount asserted that it was entitled to offset against any amounts owed Steelwood costs it incurred in discharging the liens placed by the suppliers. It asserted

that Steelwood was obligated to pay the suppliers and failed to do so and, therefore, the liens "arose out of an act or omission of Steelwood." Steelwood responded that it was undisputed that Catamount failed to pay the $300,000 due under the purchase order:

> "Catamount doesn't dispute that it received the materials under the Purchase Order. Nor does Catamount allege that * * * any of the materials were defective or nonconforming. Nor does Catamount dispute that all the materials were used on the project. Nor does Catamount dispute that it didn't pay for the materials after being billed for them. In fact, Catamount gives no defense or justification as to why it didn't pay for the materials."

According to Steelwood, "[b]y failing to pay for the materials" as required under the purchase order, "Catamount triggered a chain of events which culminated in Steelwood and its material suppliers filing liens against the project." In other words, it was Steelwood's position that it was Catamount's act or omission that resulted in the liens and, therefore, Steelwood was not responsible for any costs associated with those liens.

During the hearing, the court heard argument from the parties regarding paragraph 32. Catamount took the position that, under paragraph 32 of the subcontract, Steelwood was responsible for the costs to discharge all the liens. The court then questioned Steelwood's attorney regarding the effect of the provision, asking how Steelwood "g[o]t around paragraph 32." Steelwood's attorney argued that "[paragraph] 32 in the construction industry presupposes in that contract that Catamount is going to pay Steelwood, and Steelwood is going to take that money and pay his material men." The court clarified:

> "THE COURT:  So you're saying that the lien doesn't arise out of an act or omission of the subcontractor because—
>
> "[STEELWOOD'S COUNSEL]:  No. Not at all. If you—
>
> "THE COURT:  —the act or omission was that of Catamount to start the chain of events.
>
> "[STEELWOOD'S COUNSEL]:  Yeah. They refused to pay."

Catamount's attorney responded that there was "no implied pay-when-paid clause." Rather, according to Catamount's counsel, paragraph 32 "says plainly that if an act or omission * * * leads to a lien, then the contractor is entitled to its costs and fees in dealing with the lien." The court, however, agreed with Steelwood and concluded that "under these circumstances that it was an act or omission of the contractor, not an act or omission of the subcontractor that started the chain of events that resulted in these subs not being paid." The court looked at the purchase order and the subcontract, as well as the joint check agreement, which, it observed, provided that "Catamount was to endeavor to make monthly payments jointly to the supplier and subcontractor, and all amounts owing to the supplier during the course of the project." Having read the agreements together, the court concluded that Catamount was not entitled to offset the amounts it paid to discharge the liens. In other words, the court relied on the agreements to conclude that it was Catamount's act or omission that gave rise to the liens.

In its fourth assignment of error, Catamount challenges the court's reasoning with respect to the joint check agreement, asserting that the joint check agreement did not impose on it an obligation to "pay Shelter Products independent of its obligation to pay Steelwood." In its fifth assignment of error, Catamount asserts that summary judgment was inappropriate in this case because it was entitled to offset amounts it owed Steelwood by costs it incurred in discharging suppliers' liens. As part of that assignment of error, Catamount contends that paragraph 32 of the subcontract is unambiguous, and that the trial court improperly considered extrinsic evidence of the meaning of that provision. As explained below, we conclude that the trial court properly interpreted paragraph 32 of the subcontract based on the text and context of that provision and, in light of that interpretation, correctly concluded that Catamount was not entitled to offset amounts it expended in discharging the suppliers' liens. In light of that conclusion, we reject both the fourth and fifth assignments of error.

To interpret a contractual provision, the court begins by examining the text of the provision in question "in the context of the document as a whole. If the provision is clear, the analysis ends." *Yogman*, 325 Or at 361. "Words or terms of a contract are ambiguous when they can, in context, be given more than one meaning." *Id.* at 363-64 (internal quotation marks omitted). If the provision in question is ambiguous, the trier of fact will "ascertain the intent of the parties and construe the contract term consistent with the intent of the parties." *Id.* at 363 (internal quotation marks omitted). To resolve that question, the trial court may consider extrinsic evidence relating to intent. *Id.* "If the meaning of a contractual provision remains ambiguous after the first two steps have been followed, the court relies on appropriate maxims of construction." *Id.* at 364.

We begin by addressing Catamount's contention that, on summary judgment, the trial court improperly considered extrinsic evidence in interpreting paragraph 32 of the subcontract. It asserts that the trial court "create[d] an ambiguity" by allowing and adopting extrinsic evidence that "'the construction industry presupposes in that contract that Catamount is going to pay Steelwood.'" Additionally, it argues that "the nature of the [extrinsic] evidence Steelwood submitted was not sufficient" because it was an "argument that was entirely unsupported by anything in the record, but was merely an oral assertion." The fundamental problem with Catamount's first assertion is illuminated in that second argument. That is, the trial court did not consider (nor was it presented with) any extrinsic evidence regarding the meaning of paragraph 32 of the subcontract. Instead, the court heard legal argument from Steelwood's counsel regarding how paragraph 32 should be interpreted. Catamount made no objection to the propriety of that argument, but merely provided its own arguments regarding the import of paragraph 32. Under those circumstances, Catamount's contention that the court improperly considered extrinsic evidence regarding the meaning of paragraph 32 is without merit; we agree with Steelwood that the court made its determination based on the text of the agreements and the undisputed facts.

Turning to the proper interpretation of paragraph 32, based on the text of provision, in context, we agree with the trial court's conclusion that Catamount was not entitled to offset amounts it expended to discharge the suppliers' liens. As noted, paragraph 32 of the subcontract provides that Steelwood is responsible to pay costs and fees incurred as a result of suppliers' liens if those liens "arise[ ] out of any act or omission" of Steelwood under the agreement. Conversely, then, if the lien in question does not arise out of an act or omission of Steelwood, *i.e.*, if the lien arises out of an act or omission of Catamount, then Steelwood is not responsible for the costs and fees associated with discharging the lien under paragraph 32. The term "arising out of" means "to originate from a specified source." *Webster's Third New Int'l Dictionary* 117 (unabridged ed 2002). Originate, in turn, means to "cause the beginning of" or "give rise to." *Id.* at 1592.

In this case, Steelwood (by way of its suppliers) provided materials for the project pursuant to the purchase order. After the materials were provided, Catamount never asserted that there was any problem with them. Although, after accepting the materials, Catamount had a legal obligation to pay, it failed to do so. Instead, after terminating the contract for convenience, Catamount refused to make payment for any of the labor or materials it had received pursuant to its agreements with Steelwood. It was that refusal to pay any amount to Steelwood, including amounts clearly owing under the purchase order, despite an obligation to do so, that led to the liens at issue.[8] Thus, in view of the unambiguous terms of the contract, together with the facts on summary judgment, the liens in question clearly arose out of an act or omission of Catamount, rather than an act or omission of Steelwood.[9] The trial court did not err in so concluding.

---

[8] We note that the amount due pursuant to the purchase order (along with the subcontract) at the time of the termination for convenience was far greater than any amount Catamount later asserted was due for offsets. Indeed, as the trial court observed, it "was pretty cheeky [for Catamount] to come in here and ask [Steelwood] to pay all the fees related to the litigation that had to be filed to force payment" from Catamount.

[9] The joint check agreement, which the trial court discussed in its reasoning, supports that conclusion. As noted, the subcontract provides that Catamount

In light of the foregoing, we conclude that the trial court properly granted summary judgment in favor of Steelwood.

Limited Judgment affirmed; appeal from "Supplemental Limited Judgment" dismissed.

---

may make payment to Steelwood through "checks made payable to the joint order" of Steelwood and Steelwood's suppliers. At the same time as it entered into the subcontract and purchase order, Catamount also entered into a joint check agreement with both Steelwood and Shelter Products, one of the suppliers on the project. Under that joint check agreement, Catamount agreed to "endeavor to make monthly payments jointly" to Steelwood and Shelter Products for any amounts owing to Shelter Products for materials and services provided on the project. We note that, although Catamount makes a number of arguments that are directed at the trial court's inclusion of the joint check agreement in its reasoning regarding the interpretation of paragraph 32, those arguments actually relate to the trial court's ultimate conclusion that it was an act or omission of Catamount that led to the liens in this case. Given that we agree with the trial court's interpretation of paragraph 32 and its conclusion that Catamount's act or omission gave rise to the liens, we do not discuss the joint check agreement further.